FILED
CLERK, U.S. DISTRICT COURT

MAR 17 2010

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RON CROSS, an individual,<br><br>         Plaintiff,<br><br>v.<br><br>ROADWAY EXPRESS, INC.,<br><br>         Defendant. | Case No.  CV 07-5753 AHM (JCx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.   **FINDINGS OF FACT**

Most of the following findings were proposed by Defendant.  In a few instances, the Court modified them, and it deleted a few.  The changes appear in **bold.**  In addition, the Court finds as proven the various facts set forth in the Amended Court Exhibit A, which is attached hereto and incorporated by reference. Although the entries in the left column of that attachment tended to support Plaintiff's contentions, even so Plaintiff failed to sustain his various burdens of proof.

In addition, the Court finds that to the extent there were conflicts in the testimony of Plaintiff compared to others (such as Gerloff), Plaintiff's credibility was seriously compromised by his admissions at trial that entries in exhibits such as his resume (Exh. 28) and his insurance application (Exh. 57) were untrue or misleading.  Mr. Cross was a reasonably appealing witness but his answers to questions dealing with taxes and tax returns left the court with a strong conviction that he had "played games" in that arena, too.

1.   **Defendant Roadway Express, Inc. ("Roadway")** is a less-than-truckload motor carrier engaged in transporting freight through a distribution network, which includes rail and over the road operations.  The Roadway network consists of large distribution centers which perform a consolidating function and service centers, or terminals, which perform the function of pick up and delivery of commodities to the customer base.

2.   Roadway has commonly used vendors to provide services which were not a part of its regular business function of transporting freight, including for maintenance, janitorial and security services.

3.    Depending on the size of the vendor company or the nature of the services provided, the terms of these vendor relationships have not always been reduced to a formal, written contract.

4.    Ron Cross ("Cross"), an individual residing in California, is a 12-year veteran of the Los Angeles County Sheriff's Office, who did business under the fictitious name Cross Investigations.

5.    Cross formed Cross Investigations in 1996.

6.    Cross represented himself to third parties, including potential employers, as the owner of Cross Investigations.

7.    Cross Investigations held a business license from the City of Glendora.

8.    Cross Investigations maintained business checking accounts.

9.    Cross Investigations had a business mailing address.

10.    For each year from 1997 through at least 2007, Cross filed a Federal Tax Form Schedule C, which is a form sole proprietor business owners file to disclose "Profit or Loss From Business."

11.    Cross Investigations took tax deductions for the expense of the home office maintained for Cross Investigations.

12.    Cross Investigations took tax deductions for the cost of its equipment as a business expense.

13.    Cross Investigations took tax deductions for car and truck expenses.

14.    Cross Investigations took tax deductions for insurance.

15.    Cross Investigations took tax deductions for legal and professional services.

16.    Cross Investigations took tax deductions for meals and entertainment.

17.    Cross Investigations took tax deductions for office expenses.

18.    Cross Investigations took tax deductions for repairs and maintenance.

19.    Cross Investigations took tax deductions for supplies.

20.    Cross Investigations took tax deductions for travel.

21. Cross Investigations took tax deductions for informants.

22. Cross Investigations took tax deductions for telephone bills.

23. Cross Investigations took tax deductions for bank fees.

24. Cross Investigations took tax deductions for subscriptions.

25. Cross Investigations engaged subcontractors to perform services for its customers.

26. Cross Investigations maintained errors and omissions insurance from time to time.

27. Cross Investigations hired third parties to perform clerical services for the business.

28. Cross Investigations entered into "Sub-Contractor Agreements" with subcontractors.

29. Cross Investigations issued subcontractors IRS Form 1099s.

30. Cross Investigations purchased and provided its subcontractors with uniform "Security" jackets.

31. Jon Gerloff, Roadway's Western Division Security Manager, used vendors, including, Cross Investigations, to perform surveillance, investigation and other security related services in various locations.

32. Roadway also engaged Cross Investigations to perform projects including devising a system for Roadway to more effectively review surveillance video and "creat[ing] the whole system" for an identification badge system at Roadway's Southern California terminals.

33. Cross Investigations submitted invoices to Roadway for work performed by Cross and for the work Cross Investigations' subcontractors performed.

34. Cross Investigations **sometimes** charged Roadway $35.00 or $50.00 per hour but paid Cross Investigations' subcontractors $5.00 to $20.00 per hour less.

35.    Cross Investigations had the opportunity to and did perform services for other customers.

36.    Cross used a resume which indicated that he was an owner/investigator for Cross Investigations which had customers including Eagle Global Logistics, Covenant Transportation, Fedex and UPS. **(The latter two entities were not, in fact, customers.)**

37.    Cross Investigations provided security evaluation services to Rehab Center of Beverly Hills.

38.    Throughout the relevant time period, Cross knew that Roadway characterized and treated Cross Investigations as a vendor and independent contractor and that he was not an employee.

39.    Roadway paid Cross Investigations' invoices and issued IRS form 1099's to Cross Investigations for services purchased from Cross Investigations.

40.    In order to initiate a project, Gerloff or someone else representing Roadway would inform Cross Investigations regarding what the company was looking for on a particular assignment, in terms of what needed to be accomplished and how much time they wanted to budget for it.

41.    Cross Investigations knew how and determined how to carry out projects and assignments obtained from Roadway.

42.    Nobody at Roadway told Cross how to conduct an investigation or how to conduct surveillance.

43.    Roadway did not require Cross to attend Roadway employee staff meetings.

44.    Roadway did not subject Cross to performance reviews.

45.    Roadway did not require Cross to clock in and out in Roadway's employee timekeeping system.

46.    Roadway did not provide Cross with an employee handbook that he was required to acknowledge.

47.   Roadway did not assign Cross an email address on the Roadway system.

48.   Roadway did not assign Cross any Roadway administrative staff.

49.   In the fall of 2006, Corporate Security for YRC determined that the use of a Security Investigator—Rail position (the "Position") had been successful in the Chicago area and decided to create the Position in Southern California, patterned after the Chicago program.

50.   At the time the program was expanded to California, David McEldowney and Patrick Kelley held the Position in Chicago.  Neither McEldowney nor Kelley had law enforcement or security backgrounds.  Both had come to the Position from supervisory operations positions in Yellow and Roadway.

51.   The Chicago program was established to improve productivity in less-than-truckload operations.  The operations involve picking up and delivering shipments of freight that would not alone fill an entire truckload and taking them to one of YRC's terminals or "service centers" where they are combined with other less-than-truckload shipments and then delivered to their ultimate destinations.  The railroad is an integral partner with respect to transportation of products across the country because it allows for the movement of massive amounts of cargo with the use of fewer resources than are required to move freight over the road for long distances.

52.   The efficiency and productivity of drivers providing pick-up and drop off services at the rail yards is **important**.  When shipments arrive at a rail yard where Roadway picks up goods, its drivers are expected to be onsite on time to pick up trailers, hook the trailers and transport them back to the distribution centers where the deconsolidation and consolidation takes place in order to deliver goods to our customers. This movement to and from the rail yards and distribution centers

must occur as safely and expeditiously as possible so that the process of getting product to customers will not be delayed or interrupted.

53.    The Position was designed to increase productivity by increasing trips between the terminal and the rail yard and decreasing a drivers' time in a rail yard. It was important for the individuals in the Position to maintain good working relationships with the rail yard operators by, among other things, managing the conduct of Roadway and Yellow's drivers while they were working in the rail yards and ensuring compliance with the rail yards' rules and regulations.

54.    YRC wanted to hire someone with substantial knowledge and experience in how Yellow and/or Roadway operations function.  The company needed someone who would have a good understanding of what caused delays in getting drivers out of the terminal (was the delay caused by dispatch issues, equipment readiness issues, driver management issues), what caused delays of the drivers en route to their destination, and what efficiencies could be implemented to get the driver out of the rail yard as quickly and safely as possible.  The greater the operational knowledge, the greater value that person would yield to the Position.

55.    Although the Position involved some surveillance activities of the drivers while they were on the road and in the rail yards, Meeks and Owen believed they could train an operations person to handle the surveillance but could not provide the necessary operations experience to someone with just a security background.

56.    Some of Meeks' preferred qualifications for the Position included:

- direct knowledge of the workings of the rail shuttle between the company's satellite terminals and their distribution centers;
- knowledge of the workings of the Burlington Northern Santa Fe Railroad and the Union Pacific Railroad;
- direct knowledge of Hazmat handling and **certification to do so**, if possible; and

- 6 -

1
2       •    direct experience dispatching the employees who would work
3            out of these satellite terminals to the railroad (with knowledge of
4            their personalities and their work habits).

5      57.    Meeks and Owen received close to 100 applications and resumes for
6  the Position.  They decided to interview 6 people to fill two slots in California.

7      58.    Cross applied for the Position.  Meeks and Owen interviewed him at
8  Jon Gerloff's request as a courtesy.

9      59.    Cross did not have operations experience in the transportation
10 industry, other than his involvement in security.

11     60.    Cross had no experience with dispatching rail loads or otherwise
12 managing operations in or related to the rail yards where Roadway employees
13 worked.

14     61.    Meeks' and Owen's decision to hire Rust and Rogers was based on
15 their extensive operational experience.  **The Court finds credible Owen's**
16 **testimony that during the interview Cross came over as if he were assured of**
17 **getting the job.**

18     62.    Rust's operational experience included his work as a dock supervisor
19 and dispatcher which involved him in Roadway's rail operations.

20     63.    Rogers' operational experience included roles in regional operations
21 management and management of an entire terminal facility.

22     64.    No management employee at Roadway expressed any animus toward
23 Cross based on his age.

24     65.    During Cross's interview for the Position, Meeks learned that Cross
25 Investigations had been providing Roadway services as a security vendor without
26 signing YRC's standard vendor agreement and without obtaining the insurance
27 coverage YRC required its vendors to have.

28     66.    In February 2007, Meeks sent Cross a copy of the standard vendor
agreement and accept the same rate Roadway paid to ABM Security Services,

Roadway's security services vendor for its other facilities in the Los Angeles area in order to continue providing services as a Roadway vendor.

67.    Cross Investigations was not willing to continue to provide guard services to Roadway at the rate Roadway was paying to ABM Security Services ($13.57 per hour for unarmed guard services).

68.    ABM replaced Cross Investigations, accepting the standard vendor agreement and hourly rate offered to but declined by Cross Investigations.

69.    In the spring of 2007, Roadway Area Director of Operations Ralph Santarelli asked **Ricardo Simmons,** Roadway's Director of Regional Operations if he would interview Cross for a job with Roadway.  Simmons had an opening for a frontline supervisor and Mike Nolan, the Relay Manager/Service Team Manager for the Bloomington terminal and Simmons interviewed Cross for the position.

70.    Simmons offered Cross a job as a Yard Control Supervisor.  The job would have paid $55,000 annually, plus benefits and potential for advancement.

71.    Subsequently, Simmons received a letter from Cross turning the job offer down and expressing that Cross had wanted a managerial position and not a supervisor position.

72.    The supervisor position would have given **Cross** the chance to become a Roadway employee and to learn and gain experience in operations.

## II.    CONCLUSIONS OF LAW

**To the extent that the Court previously dismissed any of the claims for relief that Cross asserted in the Complaint, those rulings are reaffirmed herein and incorporated by reference.  They will not necessarily be separately enumerated.**

1.    The Court has jurisdiction of this action, pursuant to 28 U.S.C. § 1367.

2.    Cross failed to prove that Roadway misclassified him as an independent contractor instead of an employee from April 1992 (or from 1996) until his termination by Roadway in February 2007. Therefore, Cross is not entitled to declaratory relief that during this time period Roadway was required to treat him as an employee rather than as an independent contractor.

3.    Because Cross failed to prove that Roadway misclassified him as an independent contractor instead of an employee, Cross is not entitled to the relief he seeks in his Second, Third, and Fourth Claims for violations of Lab. Code §§ 201, 226(a), 510, or 1194.

4.    Cross failed to prove that Roadway refused to hire him to the position of "Security Investigator – Rail" because of his age, in violation of the California Fair Employment & Housing Act, Gov. Code § 12900, *et seq.* ("FEHA"). Therefore, Cross is not entitled to the relief he seeks in his Sixth Claim.

5.    Because Cross failed to prove that Roadway violated the California Labor Code or FEHA, Cross also failed to prove that such violations constitute unfair business practices in violation of California Bus. & Prof. Code § 17200, *et seq.* Therefore, Cross is not entitled to the relief he seeks in his Seventh Claim.

1
2          Judgment shall be entered in Roadway Express, Inc.'s favor consistent
3    herewith.  Roadway shall lodge the proposed judgment by not later than March 22,
4    2010.
5
6
7
8
9    Dated:   March 17, 2010
10                                              HONORABLE A. HOWARD MATZ
                                                U.S. DISTRICT COURT JUDGE
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1  DON S. LEMMER, Bar No. 139453
   Email: dlemmer@lemmerlaw.com
2  THE LEMMER LAW FIRM
   330 North Brand Boulevard, Suite 702
3  Glendale, California 91203
   Telephone: 818.507.1053
4  Facsimile: 818.507.1252

5  Attorneys for Plaintiff
   RON CROSS
6

7  JOSEPH L. CHAIREZ, Bar No. 98698
   Email: jchairez@bakerlaw.com
8  BAKER & HOSTETLER LLP
   600 Anton Boulevard, Suite 900
9  Costa Mesa, CA 92626-7221
   Telephone: 714.754.6600
10 Facsimile: 714.754.6611

11 MARGARET ROSENTHAL, Bar No. 147501
   Email: mrosenthal@bakerlaw.com
12 SABRINA L. SHADI, Bar No. 205405
   Email: sshadi@bakerlaw.com
13 BAKER & HOSTETLER LLP
   12100 Wilshire Boulevard, 15th Floor
14 Los Angeles, California 90025-7120
   Telephone: 310.820.8800
15 Facsimile: 310.820.8859

16 Attorneys for Defendant
   ROADWAY EXPRESS, INC. N/K/A YRC INC.
17

18            UNITED STATES DISTRICT COURT

19            CENTRAL DISTRICT OF CALIFORNIA

20

| RON CROSS, an individual, | Case No. CV 07-05753 AHM (JCx) |
|---|---|
| Plaintiff, | [Honorable A. Howard Matz] |
| v. | |
| ROADWAY EXPRESS, INC., | **AMENDED** ~~**PROPOSED**~~ **COURT EXHIBIT A** |
| Defendant. | Trial Date: March 2, 2010 |
| | Action Filed: August 10, 2007 |

27

28

BARRISTERS, 000983, 000139, 502770055.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

| Undisputed Facts Favoring Plaintiff | Undisputed Facts Favoring Defendant |
|---|---|
| 1. Security is a very critical part of Roadway's business because, as a freight carrier, the possible loss of customer's goods through theft is a constant concern for Roadway. Therefore, Roadway has a corporate security department charged with the protection of not only its customer's goods, but also Roadway's own property. | 1. Roadway is a less-than-truckload motor carrier engaged in the business of transporting freight and operates terminals throughout the United States, including Southern California. |
| 2. Gerloff told Cross that Roadway wanted him to submit invoices for the work he performed. | 2. Roadway has commonly used vendors to provide services which were not a part of its regular business function of transporting freight, including for maintenance, janitorial and security services. |
| 3. Cross never had a written contract while he provided services to Roadway. | 3. Plaintiff is a 12 year veteran of the Los Angeles County Sherriff's Department. *Cross Exhibit 1* |
| 4. Cross stated in his deposition "I guess maybe I do have to step back on that [his prior statement that 'Nobody tells me how to conduct an investigation.'] I am told what, where, when, and *how* . . . as to an | 4. Cross testified at his deposition that "Nobody [told Plaintiff] how to conduct an investigation" or how to conduct surveillance. |

- 2 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

| Undisputed Facts Favoring Plaintiff | Undisputed Facts Favoring Defendant |
|---|---|
| investigation." | |
| 5.    Cross provided services to Roadway for approximately 15 years. | 5.    Cross formed a business and obtained a fictitious business name of Cross Investigations in 1996. |
| 6.    With respect to Roadway's claim that Cross "hired third parties to perform clerical services for the business," Cross testified that this was a few payments to his daughters for helping him with paperwork when they were home from college. | 6.    Cross Investigations hired third parties to perform clerical services for the business.<br>*Cross Exhibit 20* |
| 7.    Cross had business cards that identified him as "Roadway Security."<br>*Trial Exhibit 29* | 7.    Cross Investigations maintained bank accounts.<br>*Cross Exhibit 20*<br>*Cross Exhibit 21* |
| 8.    Cross had badges that identified him as a "Roadway Security Manager" or "Roadway Security."<br>*Trial Exhibit 30* | 8.    Cross Investigations maintained a business mailing address. |
| 9.    Roadway occasionally provided Cross equipment he used to provide services to Roadway – a vehicle tracking device on a laptop on one occasion, cameras and a video camera. | 9.    Cross Investigations purchased and provided its subcontractors with uniform "Security" jackets. |

- 3 -

BAKER & HOSTETLER LLP<br>ATTORNEYS AT LAW<br>LOS ANGELES

| Undisputed Facts Favoring Plaintiff | Undisputed Facts Favoring Defendant |
|---|---|
| 10.   Cross Investigations did not invoice Roadway for a different rate based on the services being provided. | 10.   Cross Investigations charged Roadway the same rate no matter how much of the charge it paid its subcontractors. *Cross Exhibit 9* *Trial Exhibit 54* |
| 11.   Certain "Cross Investigations" invoices stated that Cross Investigations was providing the services of "Assistant Security Manager." | 11.   Cross Investigations had an insurance policy for at least one year. *Trial Exhibit 57* *Trial Exhibit 58* |
| 12.   Cross testified at union hearings on grievances filed by employees disciplined as a result of his investigations. | 12.   Cross took tax deductions for the cost of Cross Investigations' equipment as a business expense. *Trial Exhibit 32* |
| 13.   Cross provided services at various Roadway locations in Southern California and other areas from time to time. | 13.   Cross took tax deductions for the expense of the home office maintained for Cross Investigations. *Trial Exhibit 32* |
| 14.   During the period when Cross provided services to Roadway, he and Gerloff sometimes worked on the same investigations. | 14.   Cross Investigations took tax deductions for car and truck expenses. *Trial Exhibit 32* |
| 15.   Cross applied for and received | 15.   Cross Investigations took tax |

-4-

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

| Undisputed Facts Favoring Plaintiff | Undisputed Facts Favoring Defendant |
|---|---|
| unemployment insurance benefits from the Employment Development Department ("EDD"). | deductions for insurance. *Trial Exhibit 32* |
| 16.  Cross claims that the Security Investigator job description he reviewed reflected the services he had provided to Roadway. | 16.  Cross Investigations took tax deductions for legal and professional services. *Trial Exhibit 32* |
| 17.  Cross was 57 years old at the time he applied for the Security Investigator-Rail position. | 17.  Cross Investigations took tax deductions for meals and entertainment. *Trial Exhibit 32* |
| 18.  After the relationship between Roadway and Cross Investigations ended, Cross filed a Complaint of Discrimination with the California Department of Fair Employment and Housing and received a Notice of Case Closure *Cross Exhibit 23* *Trial Exhibit 49* | 18.  Cross Investigations took tax deductions for office expenses. *Trial Exhibit 32* |
| 19.  After Cross Investigations and Roadway's relationship ended, Cross immediately started looking for another security investigator position. | 19.  Cross Investigations took tax deductions for repairs and maintenance. *Trial Exhibit 32* |

- 5 -

| Undisputed Facts Favoring Plaintiff | Undisputed Facts Favoring Defendant |
|---|---|
| Trial Ex. 28 contains his job search documents that he initially gave to Roadway. Since that initial production, he has also given Roadway 238 pages of documents showing his continuing job search. | |
| 20.    In addition to his job search, Cross applied for and received a private security investigator license from the State of California. | 20.    Cross Investigations took tax deductions for supplies. *Trial Exhibit 32* <br> 21.    Cross Investigations took tax deductions for travel. *Trial Exhibit 32* |
| 21.    Since Cross Investigations' relationship with Roadway ended, Cross obtained security investigator-related projects and earned income. | 22.    Cross Investigations took tax deductions for informants. *Trial Exhibit 32* |
| 22.    Cross testified that after his relationship with Roadway ended, he did not continue to provide services as Cross Investigations. | 23.    Cross Investigations took tax deductions for telephone bills. *Trial Exhibit 32* |
| | 24.    Cross Investigations took tax deductions for bank fees. *Trial Exhibit 32* |
| | 25.    Cross Investigations took tax |

- 6 -

BAKER & HOSTETLER LLP<br>ATTORNEYS AT LAW<br>LOS ANGELES

| Undisputed Facts Favoring Plaintiff | Undisputed Facts Favoring Defendant |
|---|---|
| | deductions for subscriptions. *Trial Exhibit 32* |
| | 26.   Cross Investigations had a business license from the City of Glendora. *Trial Exhibit 33* |
| | 27.   Roadway knew that Cross and Cross dba Cross Investigations provided services to other companies and encouraged him to do so. |
| | 28.   Cross Investigations engaged subcontractors to provide services for its customers. *Cross Exhibit 13* *Cross Exhibit 18* *Trial Exhibit 54* |
| | 29.   Cross Investigations took applications from potential sub-contractors. *Cross Exhibit 12* |
| | 30.   Cross Investigations entered into Sub-Contractor Agreements with subcontractors. *Cross Exhibit 13* |
| | 31.   Cross Investigations issued its subcontractors IRS Form 1099s. *Cross Exhibit 18* |

- 7 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

| Undisputed Facts Favoring Plaintiff | Undisputed Facts Favoring Defendant |
|---|---|
| | 32.    Cross Investigations charged Roadway between $35 and $50 per hour but paid its subcontractors $5 to $20 less for the services they provided. *Bleecker Exhibit 6* |
| | 33.    Cross Investigations had the opportunity to and did perform services for other customers, including Eagle Global Logistics, Covenant Transportation and Rehab Center of Beverly Hills. *Cross Exhibit 1* *Cross Exhibit 21* |
| | 34.    Cross Investigations invoiced Roadway for reimbursement of mileage expenses for Cross and Cross Investigations' subcontractors but paid the subcontractors half of what Cross Investigations charged Roadway. |
| | 35.    In order to initiate a project, Gerloff or someone else representing Roadway would inform Cross Investigations regarding what the company was looking for on a particular assignment, in terms of what needed to be accomplished and how much time they wanted to budget for it. |
| | 36.    Roadway would "give [Cross |

- 8 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

| Undisputed Facts Favoring Plaintiff | Undisputed Facts Favoring Defendant |
| --- | --- |
| | Investigations] a task and say 'make it work'". |
| | 37.    Roadway characterized Cross dba Cross Investigations as a vendor and independent contractor. |
| | 38.    Cross Investigations submitted invoices to Roadway for work performed by Cross and for the work Cross Investigations' subcontractors performed. *Cross Exhibit 9* |
| | 39.    Roadway paid Cross Investigations' invoices for work performed by Cross and Cross Investigations' subcontractors. |
| | 40.    Roadway issued IRS Form 1099's to Cross Investigations for its services. *Cross Exhibit 55* |
| | 41.    Roadway did not give Cross a W-2. |
| | 42.    Roadway did not subject Cross to performance reviews. |
| | 43.    Roadway did not require Cross to clock in and out in Roadway's employee timekeeping system. |

- 9 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

| Undisputed Facts Favoring Plaintiff | Undisputed Facts Favoring Defendant |
|---|---|
| | 44.    Roadway did not provide Cross with an employee handbook that he was required to acknowledge. |
| | 45.    Roadway did not assign Cross an email address on the Roadway system. |
| | 46.    Roadway did not require Plaintiff to attend Roadway employee staff meetings. |
| | 47.    Roadway did not participate in any evidentiary hearing regarding whether Cross was entitled to unemployment benefits. |
| | 48.    In the fall of 2006, Corporate Security for Roadway's parent company determined that the use of a Security Investigator—Rail position (the "Position") had been successful in the Chicago area and decided to create the Position in Southern California, patterned after the Chicago program. |
| | 49.    Gary Meeks, Manager of Contracts and Compliance, and Harold "Bubba" Owen, YRC Director of Corporate Security, Central District testified that they were searching for two individuals with |

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 10 -

| Undisputed Facts Favoring Plaintiff | Undisputed Facts Favoring Defendant |
|---|---|
| | significant experience in the less than truckload operations to fill the Position. |
| | 50.    Dave McEldowney and Patrick Kelley held the Position in Chicago. |
| | 51.    Meeks and Owen interviewed the job applicants and decided  who would be offered the Position. |
| | 52.    Cross applied for the Position using a resume and Monster.com application which identified his most recent work history as owner/investigator for Cross Investigations from 4/92 to the present. *Cross Exhibit 2* |
| | 53.    Owen and Meeks interviewed Cross for the Position. |
| | 54.    Owen and Meeks hired Wesley Rust, a 27-year old Senior Dispatcher and former rail coordinator, and Mark Rogers, a 49-year old Account Executive and former Branch/Terminal Manager, for the Position. |
| | 55.    Cross had no working experience involving line haul, shuttle and LTL supervision. |
| | 56.    Cross was not knowledgeable of the rail industry and had no experience with |

- 11 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

| Undisputed Facts Favoring Plaintiff | Undisputed Facts Favoring Defendant |
|---|---|
| | dispatching rail loads or otherwise managing operations in or related to the rail yards where Roadway employees worked. |
| | 57.  Other than through his security work, Cross was not knowledgeable regarding basic trucking and marketing concepts and did not possess insight into proper freight handling, loading or driver procedures. |
| | 58.  No management employee at Roadway expressed any animus toward Cross based on his age. |
| | 59.  Roadway eliminated the Security Investigator-Rail job that Rogers and Rust held, and Rogers and Rust were laid off on September 4, 2008. |
| | 60.  In February 2007, Cross, dba Cross Investigations, was asked to sign the standard vendor agreement and accept the same rate Roadway paid to ABM Security Services, Roadway's security services vendor for its other facilities in the Los Angeles area. |
| | 61.  Cross Investigations was not willing to continue to provide guard services to |

- 12 -

| Undisputed Facts Favoring Plaintiff | Undisputed Facts Favoring Defendant |
|---|---|
| | Roadway at the rate Roadway was paying to ABM Security Services ($13.57 per hour for unarmed guard services). |
| | 62.     ABM replaced Cross Investigations, accepting the standard vendor agreement and hourly rate offered to but declined by Cross Investigations. |
| | 63.     After Cross Investigations stopped providing services to Roadway, Ralph Santarelli, Area Director of Operations, searched on Plaintiff's behalf to find him an employment opportunity with Roadway. |
| | 64.     Cross interviewed with Terminal Manager Ricardo Simmons;  after the interview, Roadway offered Cross a Yard Control Supervisor position at its Bloomington Terminal with a starting salary of $55,000 per year plus benefits. |
| | 65.     Plaintiff rejected Roadway's offer of employment to become a Yard Control Supervisor. *Cross Exhibit 5* |

- 13 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1

Dated:   March 10, 2010                          BAKER & HOSTETLER LLP

2

3

4                                                /s/ Sabrina L. Shadi
                                                 JOSEPH L. CHAIREZ
                                                 MARGARET ROSENTHAL
5                                                SABRINA L. SHADI
                                                 Attorneys for Defendant
6                                                ROADWAY EXPRESS, INC. N/K/A
                                                 YRC INC.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 14 -

AMENDED PROPOSED COURT EXHIBIT A
CV 07-05753 AHM (JCX)